UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHANNA K. NISHKE,                    )
                                      )
          Plaintiff,                  )
                                      )      No. 4:11CV1085 SNLJ/FRB
                                      )
     v.                               )
                                      )
                                      )
MICHAEL J. ASTRUE, Commissioner       )
of Social Security,                   )
                                      )
          Defendant.                  )

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b), for appropriate disposition.

## I.   Procedural Background

On September 22, 2008, plaintiff Johanna K. Nishke ("plaintiff") applied for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB"), alleging disability as of June 1, 2007. (Administrative Transcript ("Tr.") at 124-30). Plaintiff's applications were initially denied, (Tr. 74-81), and she requested a hearing before an administrative law judge ("ALJ"). (Tr. 82). On January 21, 2010, plaintiff amended her alleged onset date to September 6, 2008. (Tr. 148). On February 11, 2010, a

hearing was held before an ALJ. (Tr. 24-72). On May 12, 2010, the ALJ issued a decision denying plaintiff's applications. (Tr. 4-16).

Plaintiff subsequently requested review of the ALJ's hearing decision with defendant agency's Appeals Council, which denied plaintiff's request for review on April 28, 2011. (Tr. 1-3). The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Plaintiff's Testimony

During the administrative hearing, plaintiff was represented by counsel. Plaintiff testified that she was 31 years of age, had never married, had no children, and lived by herself in a duplex. (Tr. 28-29). Plaintiff attended regular classes while in high school, graduated, and attended college for medical assisting, but did not complete an associate's degree. (Tr. 30). She testified that she could read and write and perform basic arithmetic. (Tr. 32). Plaintiff receives food stamps and Medicaid. (Tr. 33).

Plaintiff testified regarding her past work experience. Plaintiff has worked as a general office clerk, customer service clerk, courier, data entry clerk, order picker, fast food cashier, waitress, retail cashier, production, daycare worker, packager, medical assistant/aide, receptionist, convenience store clerk,

night manager, medical records clerk, housekeeper, caterer helper, fast food worker, administrative assistant, and grocery cashier. (Tr. 34-44; 67-68).

Plaintiff testified that she was diagnosed with bipolar disorder at age 21 and sought treatment, but stopped treatment at age 23.  (Tr. 48).  Plaintiff testified that her bipolar disorder "came back tenfold," and that she now took Lithium,[1] Abilify,[2] and Trazodone,[3] as well as medication for anxiety, acid reflux, and high cholesterol.  (Tr. 49-50).

Plaintiff testified that her bipolar disorder and anxiety prevented her from working.  (Tr. 52).  She testified that her anxiety caused nervousness, chest pains, nausea, irritation, and rage, and that her medications caused the side effects of thinning hair, worsening vision, and skin problems.  (Id.)  Plaintiff testified that she began cutting herself at age 9, and that she did so because voices told her to or to relieve stress.  (Id.) Plaintiff testified that she had been diagnosed with bipolar disorder at age 21, but that she had suffered from the symptoms of

_____

[1]Lithium is used to treat and prevent episodes of mania in people with bipolar disorder.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html

[2]Abilify, or Aripiprazole, is used to treat the symptoms of schizophrenia. It is also used alone or with other medications to treat episodes of mania or mixed episodes (symptoms of mania and depression that happen together).  It is also used with an antidepressant to treat depression when symptoms cannot be controlled by the antidepressant alone.
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a603012.html

[3]Trazodone is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681038.html

bipolar disorder since childhood and had been able to graduate from high school and work a number of jobs for many years.

Plaintiff testified that she owned a dog and took care of feeding and providing water for it, but that her mother provided the rest of its care. (Tr. 53-54). She testified that she cooked only microwave food, and that her mother had turned off the gas to her stove because plaintiff tended to forget things on the stove or heard voices telling her to hurt herself. (Tr. 54, 61). In a Function Report, plaintiff wrote that she wanted to burn herself when she saw the flame, but did not mention hearing voices. (Tr. 172). She testified that she could handle her own finances and was "neurotic" about maintaining her checkbook. (Tr. 54). Plaintiff testified that her mother paid her rent for her, and that she did not live with her mother because she had homicidal tendencies towards her, could picture herself "doing very bad things to her," and had had altercations with her in the past. (Tr. 55). In a Function Report, however, plaintiff wrote that she lived in a duplex next door to her mother. (Tr. 170). Plaintiff testified that she previously did not like her mother's boyfriend and wanted to kill him, but did not feel that way now. (Tr. 56). She testified that she had experienced similar feelings towards people at work and that voices sometimes told her that they did something they should not have done, and that this had resulted in verbal, but not physical, altercations. (Tr. 56-57). Plaintiff testified that she attempted suicide at age 21 with a razor blade, but first

-4-

called her mother to help her, and her mother stopped her before she was able to cut herself. (Tr. 57).

Plaintiff testified that she smoked a pack of cigarettes per day, which her mother bought for her, and had used crystal meth and marijuana in the past. (Tr. 58). She testified that she detoxed herself from crystal meth because she "was done with the game that meth had been playing with [her]" and that it was a lifestyle to which she did not want to return. (Tr. 60). She testified that she attended Narcotics Anonymous once per week. (Tr. 60-61). Plaintiff testified that her mother helped her with "pretty much everything" including paying for her medications and reminding her to do things. (Tr. 61). She testified that she saw her mother daily, and that either her mother or one of her mother's roommates went with her to the grocery store. (Tr. 61-62).

Plaintiff testified that she had panic attacks. (Tr. 62). She testified that she did "pretty much nothing" all day and could not concentrate on television programs, but kept the television on all day because it drowned out the voices. (Tr. 63). Plaintiff testified that she used to see Rachel Morel, D.O., and that Dr. Morel knew her better than any other doctor she had ever had. (Tr. 62-63). Plaintiff testified that she saw a therapist named Amethyst Taylor once per week, and that Ms. Taylor knew her well. (Tr. 64).

B. <u>Medical Records</u>

The record indicates that plaintiff saw Greg Mattingly, M.D., on May 30, 2006 and reported that her mood was "good" and she was doing well. (Tr. 205). On July 25, 2006, she reported that she felt stressed out, but Dr. Mattingly noted that she was doing fairly well and should continue her current medication protocol. (Id.) On August 22, 2006 she reported doing well and told Dr. Mattingly that she would like to stay on the medicine and that this was the best she had felt in a long time. (Tr. 206). On September 11, 2006, plaintiff stated that she wanted to decrease her Seroquel[4] dosage. (Tr. 206). Dr. Mattingly's records indicate that plaintiff was given samples of Seroquel in January of 2007. (Id.)

The record indicates that plaintiff saw Alexander Kalk, M.D., on September 5, 2008 and stated that she was applying for disability, that she felt rage, and that she needed a psychiatrist or a therapist. (Tr. 208). Dr. Kalk's impression was severe bipolar and insomnia. (Id.)

Records from St. John's Mercy Medical Center ("St. John's") indicate that plaintiff presented herself to the hospital and was admitted on September 5, 2008 due to suicidal ideation with a plan to cut her wrists. (Tr. 213). Plaintiff was seen by L. Peter Zhang, M.D., who noted that plaintiff reported having had an

---

[4]Seroquel, or Quetiapine, is used to treat the symptoms of schizophrenia, and episodes of mania or depression in patients with bipolar disorder. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a698019.html

argument with her primary care physician. (Id.) Plaintiff reported that she had reduced her dosages of medication due to financial difficulty, and had experienced exacerbation of anxiety and anger control problems. (Id.) Plaintiff reported that she could not hold a job due to her anger, and that she stopped seeing Dr. Mattingly due to loss of insurance. (Id.) Plaintiff reported that she lived next door to her mother, and also reported that she had a history of crystal methamphetamine use and had trouble holding on to a job, but that she had been sober for two and one-half years. (Tr. 214). She denied physical complaints. (Id.) Dr. Zhang noted that plaintiff had been treated with lithium and Seroquel with good results until plaintiff reduced her dosage. (Id.) Dr. Zhang adjusted plaintiff's medications, increasing her Seroquel dosage. (Id.)

Dr. Zhang subsequently noted that plaintiff "responded to treatment very well and she has been fairly calm and cooperative, and she has been able to sleep well at night," and that her suicidal ideation had resolved. (Tr. 213). Plaintiff reported feeling better after a good night's sleep. (Tr. 215). Plaintiff reported that she did not have insurance and had difficulty obtaining medications, and Dr. Zhang discussed with plaintiff options for outpatient follow-up such as a community mental health clinic, and also explained that lithium was inexpensive. (Id.)

On November 14, 2008, plaintiff saw John Yunker, M.S., for a consultative examination. (Tr. 232-38). Mr. Yunker noted

that plaintiff had driven herself to the evaluation. (Tr. 234).

Plaintiff reported that she had insomnia and was taking metformin,[5] Symbyax,[6] mirtazapine,[7] Proventil,[8] and Clarinex.[9] (Id.) Plaintiff reported that she was being evaluated for "not one thing." (Id.) She stated that every day was a roller coaster for her and that it was difficult to keep a routine, and that she felt like she had television programs playing in her head or a radio on all the time, and she was confused. (Id.) She stated that she heard whispering and saw shadows and that this added to the "mess" in her head, and that she could not plan. (Tr. 234). She stated that she was not seeing a psychiatrist, but that Dr. Kalk had refilled her medications. (Tr. 235).

Plaintiff reported that she lived alone. (Tr. 235). Plaintiff reported that she had graduated from high school and was trying to complete a degree at the Vatterott Medical Assistant's Program. (Tr. 235). She reported no alcohol or tobacco use.

---

[5]Metformin is used alone or in combination with other medications, including insulin, to control Type 2 diabetes. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a696005.html

[6]Symbyax is a combination of the drugs Olanzapine and Fluoxetine and is used to treat the symptoms of schizophrenia. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601213.html

[7]Mirtazapine (also known as Remeron) is used to treat depression. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a697009.html

[8]Proventil, or Albuterol, is used to treat symptoms of wheezing, difficulty breathing, and chest tightness. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682145.html

[9]Clarinex, or Desloratadine, is used to relieve hay fever and allergy symptoms. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a602002.html

(Id.)  Plaintiff reported that, at age 5 or 6, she was assaulted by a girl, and at age 7 or 8 she was molested by a sixteen-year-old neighbor boy.  (Id.)  Mr. Yunker noted that plaintiff's grooming was satisfactory.  (Id.)  Plaintiff reported that her father died when she was twelve years old, and that he had been a drug addict and alcoholic and that her mother would "use her in dealing with him." (Tr. 235).  Plaintiff reported that she had no full siblings but did have 13 half-siblings, all or most of whom have problems similar to hers.  (Id.)  Plaintiff reported that her stepfather had died one year ago, was also an alcoholic who was verbally abusive and had physically abused her mother, and had also tried to sexually abuse plaintiff.  (Id.)  She stated that she went to the hospital in September of 2008, but was sent home due to lack of insurance.  (Tr. 236).

When plaintiff was asked to describe her current daily activities, she stated that she tried to go to school in the morning, and in the evening she watched television because it helped "drown out things in [her] head, the whispering."  (Id.)  Plaintiff stated that she had trouble sleeping.  (Id.)  She stated that she had friends and went to movies, but did not go to bars.  (Id.)  She stated that she could not be at a restaurant because she could not be around alcohol.  (Tr. 236).  She reported that she could take care of herself and her own hygiene, but that her mom sometimes had to remind her.  (Id.)  When asked to describe her mood and affect, plaintiff stated "mostly sad, I'm often crabby."

(Id.)  She stated that she has a lot of resentment to people who have hurt her, and that she had a lot of fantasies involving different ways to hurt herself.  (Id.)

Mr. Yunker noted that plaintiff's eye contact and grammar were acceptable, and her hygiene was above average.  (Tr. 235). Mr. Yunker noted that plaintiff's level of cooperation was positive, and she was friendly.  (Id.)

Plaintiff reported that her problems and concerns were that she had trouble managing her anger; she yelled, broke things, cursed and threw things; and that she sometimes enjoyed seeing others bleed and felt vindicated.  (Id.)  Plaintiff stated that her friends knew her well enough to walk away and not argue with her, but that her mother got the worst of it.  (Id.)  Plaintiff stated that she wanted to get a psychiatrist and open up about things from her childhood.  (Tr. 236).

Mr. Yunker wrote: "In a discussion with claimant about voices, she indicated she never had voices tell her to do anything; 'it's just whispering.'" (Id.)  Plaintiff stated that, in the past, she had cut herself periodically through the day and had pierced her nose to cover up a scar from cutting.  (Id.)  Plaintiff stated that she could not work outside her home because she had trouble with consistency, and got confused and upset and had to leave or miss work.  (Tr. 237).

Mental status examination showed that plaintiff was satisfactorily oriented; had an above-average vocabulary; and

performed well in terms of abstractions but in the low average range regarding attention/concentration, information, and poorly in judgment/comprehension. (Id.) Plaintiff reported that she was not presently under the care of a psychiatrist. (Id.)

Mr. Yunker noted plaintiff's diagnosis as bipolar disorder, but observed that plaintiff had shown only mild difficulties during the evaluation. (Id.) He opined that plaintiff had only mild difficulties in understanding and remembering instructions; mild to moderate difficulties in sustaining concentration and persistence in tasks; and would have some difficulty with people who were critical of her. (Id.) Mr. Yunker rated plaintiff's Global Assessment of Functioning ("GAF") at 78. (Tr. 237).

On December 22, 2008, a Psychiatric Review Technique form was completed by Geoffrey Sutton, Ph.D. (Tr. 239-50). Dr. Sutton opined that plaintiff suffered from bipolar disorder with mild limitations in activities of daily living, social functioning, concentration, persistence, and pace. (Tr. 239). Dr. Sutton opined that plaintiff had no repeated episodes of decompensation of extended duration. (Tr. 247). Dr. Sutton noted plaintiff's inpatient treatment for anger, anxiety and suicidal ideation and that she responded well to treatment. (Tr. 249). Dr. Sutton opined that the severity of plaintiff's impairment did not meet the duration requirement, and the fact that she improved did not support the likelihood of her meeting the duration requirement.

(Id.)

Records from the John C. Murphy Health Center (also "Murphy Clinic") indicate that plaintiff was seen on February 11, 2009 for what she stated was a "routine check." (Tr. 403). Mental status examination revealed that plaintiff was alert, cooperative, and well-groomed. (Id.)

On February 23, 2009, plaintiff was seen by Dr. Morel. (Tr. 414). Dr. Morel was a medical resident. Plaintiff stated that she had been cutting herself, that she wanted to harm her mother's boyfriend, that she was not sleeping, and that the recent suicide of a friend and attempted suicide of an ex-girlfriend have caused stress. (Tr. 414). Dr. Morel noted that plaintiff was disoriented with poor eye contact, and had a depressed mood with a flat affect. (Tr. 416). Dr. Morel opined that plaintiff was depressed and was a danger to herself and others, and stated that she needed hospitalization. (Id.) She diagnosed plaintiff with bipolar affective disorder with psychosis. (Id.)

Plaintiff was admitted to St. Louis University Hospital on February 23, 2009 and discharged on February 26, 2009. (Tr. 267-382). It was noted that plaintiff had seen Dr. Morel at the Jewish Family Clinic and that Dr. Morel had sent plaintiff to the hospital. (Tr. 280). The hospital records also indicate that Dr. Morel had suggested a short hospital stay in order to adjust plaintiff's medications and re-evaluate her. (Tr. 378).

Plaintiff stated that she had recently been having

graphic thoughts about hurting her mother's boyfriend and of hurting herself. (Id.) It was noted that she had self-inflicted cuts on her abdomen. (Tr. 319). Plaintiff reported experiencing the recent stressors of the death of a friend, a serious injury involving a friend, disability, unemployment, the death of her father one year ago and anger that her mother had moved on, and stress regarding her finances and her application for disability. (Tr. 280, 295, 298). Plaintiff reported a one-month period of cutting behavior. (Tr. 280). She complained of insomnia, poor concentration, and feelings of helplessness, but denied anhedonia or hopelessness. (Id.) Plaintiff endorsed "vague auditory hallucinations consisting of loud noises sounding like a radio over TV," and also stated that, at night, she saw vague visual hallucinations. (Id.) Plaintiff also reported manic symptoms "about 2 weeks ago for about 5 days" during which she did not sleep much, spent a lot of money, had an increase in sexual activity, and showed some grandiosity. (Id.)

Plaintiff was evaluated by Robert Marietta, M.D., who noted plaintiff's past psychiatric history as including previous diagnoses of bipolar disorder and dyslexia, and previous hospitalizations at St. John's in September, 2008 when plaintiff had an urge to hurt herself, and at age 21 years at St. John's after an episode of cutting. (Tr. 280). Plaintiff reported that she smoked one to two packs of cigarettes per day and used marijuana about once per month or less, with her last use occurring

the preceding weekend. (Id.) Plaintiff reported that she last used methamphetamine three years ago. (Id.)

Upon examination, Dr. Marietta noted that plaintiff's mood was "okay" and that she made general good eye contact, was cooperative, and had a normal, non-depressed affect. (Id.) Plaintiff's speech and thought processes were normal, and her insight and judgment were fair. (Tr. 280). Her thought content was positive for suicidal and homicidal ideation with a plan, but she was not delusional. (Tr. 281). Plaintiff's "mini-mental status exam" (a test used to screen for cognitive impairment) was normal. (Id.) A drug screen was positive for marijuana, and plaintiff's lithium level was interpreted as "subtherapeutic" and "undetectable." (Tr. 281, 283). (Id.) Dr. Marietta diagnosed plaintiff with bipolar affective disorder type 1 and borderline personality disorder, and assessed a GAF of 35. (Id.)

On the morning following plaintiff's admission, she continued to endorse violent fantasies regarding her mother's boyfriend, but she seemed to calm quickly. (Tr. 283). Her lithium dosage was increased, and plaintiff tolerated this well. (Id.) Dr. Morel visited plaintiff and noted that she seemed to have improvement with the increase in the lithium dosage. (Id.) Plaintiff expressed an interest in an outpatient day program, and this was thought to be in her best interest. (Id.)

On February 25, 2009, plaintiff reported that she felt the lithium dosage had elevated her mood, and it was noted that she

would be a good candidate for a day treatment program.  (Tr. 301).
On February 26, 2009, she noted improvement in her sleep and mood
with the increase in lithium dosage, and she felt ready for
discharge the following day.  (Tr. 302).  Dr. Marietta's
examination revealed normal findings.  (Id.)  Dr. Marietta assessed
bipolar disorder with improved control with medication adjustment,
and borderline personality disorder, crisis resolved.  (Id.)  At
the time of her discharge, she had not had any violent fantasies
for several days, denied suicidal and homicidal ideation, and
denied auditory and visual hallucinations.  (Tr. 283).  It was
noted that the crisis that brought her in was thought to be
resolved, and plaintiff was discharged on February 26, 2009 in
stable condition with instructions to take her medications and
follow up with Dr. Morel.  (Id.)

On March 9, 2009, plaintiff saw Dr. Morel and reported
doing ok, but not sleeping.  (Tr. 422).  Plaintiff stated that she
was experiencing anger issues inasmuch as she was jealous for her
mother's attention and got angry at her.  (Id.)  She reported no
self-mutilation.  (Id.)  Dr. Morel noted that plaintiff's stressors
were social and financial.  (Id.)

On April 6, 2009, plaintiff saw Dr. Morel and reported
feeling depressed since her brother moved away.  (Tr. 421).  She
reported that she was in a relationship and it was going well.
(Id.)  She reported that she had to get out of the house and had
the help of a friend, and that her mother recently lost her job and

that this was stressful.  (Id.)  Dr. Morel noted that plaintiff's stressors were social, family, and financial, and that plaintiff's symptoms had worsened.  (Id.)

Plaintiff was seen at the Murphy Clinic on April 8, 2009 for an annual well-woman examination.  (Tr. 398).  Mental status examination revealed that plaintiff was alert, cooperative, not in acute distress, oriented times four, well nourished and well groomed.  (Tr. 397).  On April 16, 2009, she was seen for follow-up from a prior emergency room visit for what was believed to be kidney stones.  (Tr. 394).  Mental status examination revealed a mildly depressed mood with crying and anxiety.  (Id.)  She agreed to call 911 if she wanted to harm herself or others.  (Id.)

On May 4, 2009, plaintiff saw Dr. Morel and stated that she had broken up with her current boyfriend.  (Tr. 420).  It was noted that plaintiff had missed her last therapy session due to an early morning appointment.  (Id.)  She reported conflict with her mother regarding her recent breakup and her mother's boyfriend. (Id.)  It was noted that plaintiff had financial and family stressors, and that her symptoms were improving.  (Id.)

On June 8, 2009, Dr. Morel completed a Mental Medical Source Statement.  (Tr. 251-54).  Dr. Morel opined that plaintiff had "moderate" limitations in her ability to function independently, adhere to basic standards of neatness and cleanliness, relate to family, peers or care givers, ask simple questions or request assistance, maintain attention and

concentration for extended periods, and sustain an ordinary routine without special supervision. (Tr. 251-52). Dr. Morel opined that plaintiff had "marked" limitations in her ability to cope with normal stress, behave in an emotionally stable manner, maintain reliability, interact with strangers or the general public, accept instructions or respond to criticism, maintain socially acceptable behavior, make simple and rational decisions, perform at a consistent pace, and respond to changes in the work setting. (Id.) There were no areas in which Dr. Morel opined that plaintiff had "extreme" limitations. See (Id.) Dr. Morel opined that plaintiff could apply carry out simple instructions for four hours per day, and could interact appropriately with co-workers, supervisors and the general public for 0-2 hours. (Tr. 253). Dr. Morel opined that psychological symptoms would cause plaintiff to miss, be late for, or leave early from work three or more times per month. 253-54). Dr. Morel stated that she started seeing plaintiff on February 23, 2009, and opined that plaintiff's symptoms had lasted or could be expected to last for 12 continuous months. (Tr. 254). Dr. Morel assessed plaintiff's current GAF at 35. (Id.)

On June 10, 2009, plaintiff saw Ms. Taylor and disclosed that she had planned to harm herself by taking pills and had written a letter to friends, but then received a telephone call conveying bad news about her cousin and abandoned her plan to harm herself in order to go help her cousin. (Tr. 468). Plaintiff stated that, when her cousin was feeling better, she checked

herself into a hospital, stating that she had been hearing voices "calling her name and having discussion in her head" prior to being hospitalized. (Id.)

On June 15, 2009, plaintiff saw Dr. Morel, who noted that plaintiff had been hospitalized for suicidal ideation six days ago, but did not have suicidal ideation currently. (Tr. 419). Plaintiff reported sleeping better since starting Remeron, but that she still felt anxious during the day. (Id.)

On June 16, 2009, Ms. Taylor completed a Mental Medical Source Statement. (Tr. 255-58). Ms. Taylor opined that plaintiff had "moderate" limitations in her ability to adhere to basic standards of neatness and cleanliness, ask simple questions or request assistance, and make simple and rational decisions. (Tr. 255-56). Ms. Taylor opined that plaintiff had "marked" limitation in her ability to function independently, behave in an emotionally stable manner, maintain reliability, accept instructions or respond to criticism, maintain socially acceptable behavior, maintain attention and concentration, perform at a consistent pace, sustain an ordinary routine, and respond to changes in a work setting. (Id.) Ms. Taylor opined that plaintiff had "extreme" limitations in her ability to cope with normal stress, relate to family, peers or care givers, and interact with strangers or the general public. (Id.) She opined that plaintiff could, for four hours per day, carry out simple one or two-step instructions, and interact appropriately with co-workers, supervisors, and the general public.

(Tr. 257).  Ms. Taylor opined that psychological symptoms would cause plaintiff to miss, be late for, or leave early from work three or more times per month. (Tr. 258).  She opined that plaintiff's condition had lasted or could be expected to last for 12 or more months.  (Id.)  Ms. Taylor wrote that the information she was providing was based upon two counseling sessions and an interview.  (Id.)

Plaintiff saw Ms. Taylor on multiple occasions throughout 2009.  (Tr. 391-471).  On June 19, 2009, plaintiff saw Ms. Taylor and stated that she had been feeling overwhelmed by life and her past and had wanted to harm herself a few weeks ago, but a family crisis prevented her from doing so.  (Tr. 391).  She denied suicidal ideation at present, and stated that she was feeling better since being discharged from the hospital and that her medication was working.  (Id.)

On July 10, 2009, plaintiff saw Ms. Taylor and complained of problems with self esteem in that she did not feel she was good enough; depression, and anxiety.  (Tr. 441).

On July 24, 2009, plaintiff saw Ms. Taylor and reported that her graduation ceremony had gone well and that she had been able to invite her mother's boyfriend, even though she still had violent thoughts towards him.  (Tr. 465).

On July 27, 2009, plaintiff saw Dr. Morel and reported that she had not cut since June 3, 2009, but thought about it constantly and increased her cigarette smoking.  (Tr. 418).  She

stated that she was planning to leave that day for a two-week visit with her brother in Kansas City. (<u>Id.</u>) Mental status examination revealed that plaintiff was cooperative with fair eye contact and a normal mood. (<u>Id.</u>) Dr. Morel opined that plaintiff was currently stable, and advised her to continue her current medications. (<u>Id.</u>)

On August 20, 2009 plaintiff was seen at the Murphy Clinic with complaints of mild lower back pain following heavy lifting. (Tr. 387). Mental status examination revealed that plaintiff was alert and cooperative, and was not depressed or in acute distress. (<u>Id.</u>) Plaintiff was seen again on September 8, 2009 for dental care. (Tr. 386).

On August 24, 2009, Ms. Taylor noted that plaintiff was presently in school to become a medical assistant and was excited to be graduating. (Tr. 442). Ms. Taylor noted plaintiff's symptoms as cutting behavior, rage, and homicidal thoughts towards her mother's boyfriend, but no current ideation or plan. (<u>Id.</u>) Plaintiff reported that she was becoming more educated about her mental health diagnoses. (<u>Id.</u>) She stated that she would be out of town  visiting her brother, and would call when she returned home. (<u>Id.</u>)

Records from the Jennings Medical Center indicate that plaintiff was seen by Dr. Aqeeb Ahmad on August 24, 2009 stating that she needed a new doctor because her prior doctor did not accept Medicaid. (Tr. 437). Plaintiff stated "I have bipolar

disorder" and "I am a cutter." (Id.) She reported smoking one pack of cigarettes per day and using marijuana on and off. (Id.) She reported that she graduated from Vatterott. (Tr. 438). Dr. Ahmad noted that plaintiff's mood was worried and anxious and that she had auditory hallucinations, death wishes and assaultive ideas, but no intent or plan. (Id.) She was diagnosed with bipolar disorder and borderline personality disorder, and her GAF was assessed at 35. (Tr. 439).

On September 11, 2009, plaintiff saw Ms. Taylor and stated that she had changed regarding her mother's boyfriend ("Mike") in that she was now comfortable talking to him, and had even invited him to an event at her home and felt okay about that. (Tr. 462). Plaintiff also acknowledged that she needed to work on her relationship with Mike's daughter, and stated that she felt jealous of Mike's daughter's relationship with her (plaintiff's) mother. (Id.) Plaintiff stated that she no longer wished to harm Mike and had started talking with her mother on a regular basis in an effort to strengthen their relationship. (Id.) Plaintiff also shared some of her poetry. (Id.)

On October 30, 2009, plaintiff saw Ms. Taylor, who noted that plaintiff's problems included medication management, stopping smoking, bipolar disorder, and depression/anxiety. (Tr. 440). Recommended interventions included behavior modification. (Id.)

On December 16, 2009, Ms. Taylor completed another Mental Medical Source Statement. (Tr. 259-66). Therein, she opined that

plaintiff had "marked" limitations in her ability to cope with normal stress, function independently, maintain reliability, adhere to basic standards of neatness and cleanliness, ask simple questions or request assistance, make simple and rational decisions, maintain attention and concentration, and perform at a consistent pace. (Tr. 259-60). Ms. Taylor opined that plaintiff had "extreme" limitations in all other areas. (Id.) She opined that plaintiff could, for 0-2 hours per day, carry out simple one or two-step instructions, and interact appropriately with co-workers, supervisors, and the general public. (Tr. 261). Ms. Taylor opined that psychologically-based symptoms would cause plaintiff to miss work three or more times per month. (Tr. 258). Ms. Taylor opined that psychologically based symptoms would cause plaintiff to be late to work or need to leave work early once a month or less. (Tr. 262). She opined that plaintiff's condition had begun during childhood (this was based on plaintiff's report), and had lasted or could be expected to last for 12 or more months. (Id.)

On February 12, 2010, plaintiff presented to the emergency room of St. John's Mercy Medical Center and was admitted with complaints of worsening auditory hallucinations instructing her to harm herself, suicidal thoughts, and cutting behavior. (Tr. 480). It was noted that plaintiff had shallow cuts to her bilateral arms and lower abdomen. (Id.) Plaintiff reported that she had not slept in a week. (Id.) She reported smoking two packs

of cigarettes per day. (Tr. 481). Plaintiff was alert and oriented, and her behavior was normal. (Tr. 483).

On February 13, 2010, plaintiff was evaluated by Steven A. Harvey, M.D., who noted that while plaintiff initially stated that she had been feeling worse for the last two weeks, she later "revised her statements and said that mostly she has been feeling badly in the last two days following a social security disability hearing that (she thought) did not go very well." (Tr. 487). She said that her anxiety was "through the roof" and reported auditory hallucinations telling her to kill herself and hurt other people, and she began cutting. (Id.)

Upon mental status examination, Dr. Harvey noted that plaintiff was pleasant and cooperative, and appeared calm and comfortable. (Tr. 488). She used a lot of psychiatric jargon when describing her symptoms, and had no objective evidence of hallucinations or delusions, and had no suicidal or assaultive ideation, although she did have self-mutilation ideation. (Id.) Plaintiff reported that she lived next door to her mother, who was her main support system. (Id.) Dr. Harvey noted that plaintiff was awake, alert, and fully oriented; her long and short term memory were intact; her mood and affect appeared generally normal and stable; and her insight and judgment were fair. (Id.) Dr. Harvey noted that plaintiff had a complicated psychiatric history and that, assuming that she did have genuine bipolar disorder, she should use mood stabilization medications. (Tr. 488). Dr. Harvey

noted that plaintiff's lithium level was subtherapeutic, and increased her dosage. (Id.)

Also on February 13, 2010, plaintiff was evaluated by Sharon K. Mattingly, M.S.W., and reported increased anxiety and auditory hallucinations with urges to cut herself. (Tr. 498). Plaintiff stated "I think the disability hearing (Thursday) really put me over the edge." (Id.)

On February 16, 2010, plaintiff was evaluated by F.G. Hicks, M.D., who noted that plaintiff denied difficulty with her medications, and was conversant with good eye contact. (Tr. 495). The following day, plaintiff reported fair sleep and mood, denied medication side effects, and was accepting of making a transition to home. (Tr. 496). She denied hallucinations and denied self-mutilation urges, but remained easily irritated. (Id.)

Plaintiff was given Abilify and her lithium was resumed. (Tr. 486). Over the course of the next few days, plaintiff was noted to be more stable, and it was noted that she denied difficulties with her medications. (Id.) On February 17, 2010, she did not feel ready for discharge, but realized that Dr. Harvey was thinking about sending her home soon and encouragement was given to plaintiff. (Tr. 512). On February 18, 2010, plaintiff denied thoughts of self harm but stated that she heard voices she described as "chatter." (Tr. 513).

III.    The ALJ's Decision

The ALJ determined that plaintiff had the severe impairment of bipolar affective disorder, but did not have an impairment or combination of impairments that met or medically equaled a listed impairment. (Tr. 9-10). The ALJ considered the entire record and concluded that plaintiff retained the residual functional capacity (also "RFC") to perform a full range of work at all exertional levels but with the following limitations: she can understand, remember, and carry out at least simple instructions and non-detailed tasks; respond appropriately to supervisors and coworkers in a task-oriented setting where contact with others is casual and infrequent; and adapt to routine simple work changes. (Tr. 11).

The ALJ then heard testimony from a vocational expert ("VE"). The ALJ presented several hypothetical questions to the VE, one of which encompassed the foregoing residual functional capacity and mental limitations, and the VE testified that such an individual would be able to perform the jobs of order picker, production line worker, packager, and housekeeper. (Tr. 69). In his decision, the ALJ noted the VE's testimony and concluded that plaintiff could return to this past work, inasmuch as it did not require the performance of work-related activities precluded by plaintiff's residual functional capacity. (Tr. 15). The ALJ wrote that he had compared plaintiff's residual functional capacity with the physical and mental demands of this work and concluded that plaintiff could perform it as actually and generally performed.

(Id.)  The ALJ wrote that the VE's testimony was consistent with the Dictionary of Occupational Titles and its companion publication, the Selected Characteristics of Occupations.  (Id.) The ALJ concluded that plaintiff had not been under a disability as defined by the Act from September 6, 2008 through the date of his decision.  (Id.)

IV.    **Discussion**

To be eligible for benefits under the Social Security Act, plaintiff must prove that she is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001); Baker v. Secretary of Health and Human Services, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace.  See 42 U.S.C. §§ 423(d)(1)(A); 1382c (a)(3)(A) (defining "disability" for DIB and SSI purposes).  The Act provides disability benefits only to those unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." Id.  The Act further specifies that a person must be both unable to do her previous work and unable, "considering [her] age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of

whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work." Bowen v. Yuckert, 482 U.S. 137, 140 (1987) (citing 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B)); Heckler v. Campbell, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. See 20 C.F.R. §§ 404.1520, 416.920; Bowen, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits her ability to do basic work activities. If the claimant's impairment is not severe, then she is not disabled. The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment is equivalent to one of the listed impairments, she is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform her past relevant work. If so, the claimant is not disabled. If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform. Pearsall, 274 F.3d at 1217; Nevland v.

Apfel, 204 F.3d 853, 857 (8th Cir. 2000).  Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion.  Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

> 1. The credibility findings made by the ALJ;
>
> 2. The plaintiff's vocational factors;
>
> 3. The medical evidence from treating and consulting physicians;
>
> 4. The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments;
>
> 5. Any corroboration by third parties of the plaintiff's impairments; and
>
> 6. The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth the plaintiff's impairment.
>
> Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Court must also consider any "evidence which fairly detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d 1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608. However, where substantial evidence supports the Commissioner's decision, the decision may not be reversed merely because substantial evidence may support a different outcome. Briggs, 139 F.3d at 608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (citing Cruse, 867 F.2d at 1184).

In the case at bar, plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole. In support, plaintiff contends that the ALJ failed to properly evaluate the medical opinions of record, including the opinions of Dr. Morel and Ms. Taylor, and failed to properly examine the evidence from Mr. Yunker and Drs. Zhang and Marietta. Plaintiff also argues that the ALJ improperly assumed she was non-compliant with medication and that some improvement indicated that she was functioning well, and that the ALJ inaccurately opined that plaintiff did not receive consistent treatment. Plaintiff also argues that the ALJ failed to properly evaluate the GAF scores of record; that the ALJ failed to consider plaintiff's condition of chronic mental illness; that his RFC determination was not supported by substantial evidence; and that he improperly found that plaintiff could perform her past relevant work. In response, the Commissioner contends that substantial evidence supports the ALJ's decision.

A.   Credibility Determination

In the case at bar, the ALJ analyzed the evidence of record and concluded that plaintiff's subjective complaints were not entirely credible.  Plaintiff contends the ALJ erroneously determined that plaintiff was not compliant with her medications and did not receive consistent treatment, and that the ALJ failed to properly consider her chronic mental illness.  Review of the ALJ's decision reveals no error.

Before determining the claimant's residual functional capacity, the ALJ must evaluate the credibility of the claimant's subjective complaints.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007) (citing Pearsall, 274 F.3d at 1217.)  Testimony regarding pain is necessarily subjective in nature, as it is the claimant's own perception of the effects of her alleged physical impairment.  Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993).  Because of the subjective nature of physical symptoms, and the absence of any reliable technique for their measurement, it is difficult to prove, disprove or quantify their existence and/or overall effect.  Polaski at 1321-22.  In Polaski, the Eighth Circuit addressed this difficulty and established the following standard for the evaluation of subjective complaints:

> The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints. The adjudicator must give full consideration to all of the evidence presented relating to

subjective complaints, including the
claimant's prior work record, and observations
by third parties and treating and examining
physicians relating to such matters as: (1)
the claimant's daily activities; (2) the
duration, frequency and intensity of the pain;
(3) precipitating and aggravating factors; (4)
dosage, effectiveness and side effects of
medication; (5) functional restrictions.

Id. at 1322.

Although the ALJ is not free to accept or reject the
claimant's subjective complaints based upon personal observations
alone, he may discount such complaints if there are inconsistencies
in the evidence as a whole. Id. The "crucial question" is not
whether the claimant experiences symptoms, but whether her credible
subjective complaints prevent her from working. Gregg v. Barnhart,
354 F.3d 710, 713-14 (8th Cir. 2003). When an ALJ explicitly
considers the Polaski factors and discredits a claimant's
complaints for a good reason, that decision should be upheld.
Hogan v. Apfel, 239 F.3d 958, 962 (8th Cir. 2001). The credibility
of a claimant's subjective testimony is primarily for the ALJ, not
the courts, to decide, and the court considers with deference the
ALJ's decision on the subject. Tellez v. Barnhart, 403 F.3d 953,
957 (8th Cir. 2005).

In analyzing plaintiff's subjective complaints, the ALJ
wrote that he had considered all symptoms and the extent to which
they could reasonably be accepted as consistent with the other
evidence of record in accordance with the requirements of 20 C.F.R.
§§ 404.1529 and 416.929, and Social Security Rulings 96-4p and 96-

7p, which correspond with <u>Polaski</u> and credibility determination. The ALJ analyzed the evidence of record and concluded that plaintiff's statements concerning the intensity, persistence and limiting effects of her symptoms were not entirely credible.

The ALJ opined that the evidence was not consistent with plaintiff's allegations of the limiting effects of her bipolar disorder. The ALJ noted that plaintiff's November 2008 statement to Mr. Yunker that she had been refused hospital treatment directly conflicted with the medical records from St. John's and the report by Dr. Zhang indicating that plaintiff was in fact treated at St. John's. Indeed, plaintiff submits no evidence that she was ever refused medical treatment due to a lack of insurance or an inability to pay. The ALJ also noted that, although Mr. Yunker asked plaintiff about drug, alcohol and tobacco use, plaintiff did not report her substance abuse history or her use of tobacco, and that this was inconsistent with evidence in the record that plaintiff smoked and had used marijuana and methamphetamine. The ALJ concluded that plaintiff's responses to Mr. Yunker's questions were consistent with benefit motivation. It was proper for the ALJ to consider plaintiff's statement which was inconsistent with the record as detracting from her credibility. <u>Ply v. Massanari</u>, 251 F.3d 777, 779 (8th Cir. 2001); <u>see</u> <u>also</u> <u>Fitzsimmon v. Mathews</u>, 647 F.2d 862, 863-64 (8th Cir. 1981) (In assessing a claimant's credibility, an ALJ may properly consider a claimant's lack of sincerity).

The ALJ also noted that plaintiff told Mr. Yunker that she was not seeing a psychiatrist. The ALJ also noted that, although plaintiff only saw Dr. Morel a few times, plaintiff testified that Dr. Morel knew her better than any other treatment provider. The ALJ considered this to be consistent with the conclusion that plaintiff did not consistently seek psychiatric treatment. This was not the only observation the ALJ made concerning plaintiff's credibility, and it was proper for the ALJ to consider evidence that plaintiff was not consistently seeking psychiatric treatment for a mental condition she claimed disabled her from all work. See Novotny v. Chater, 72 F.3d 669, 671 (8th Cir.1995) (A lack of regular and sustained treatment is an indication that the claimant's impairments are non-severe and not significantly limiting for twelve continuous months).

The ALJ noted that plaintiff was repeatedly noted to have "subtherapeutic" levels of lithium in her blood, and determined that plaintiff had a history of non-compliance with her medication. Plaintiff alleges error, arguing that this was a lay assumption that lacked a proper medical basis. Plaintiff supports this statement with a footnote speculating as to other potential reasons for a person to have subtherapeutic levels of a drug in his or her system, including the extent and rate of drug absorption, distribution, tissue binding, biotransformation, and excretion. (Docket No. 16, page 14 n. 27). While these phenomena may indeed explain why some people have subtherapeutic levels of medication in

their bodies, there is no evidence in the instant record, and plaintiff offers none, tending to suggesting that this is the case here. Instead, the record supports the conclusion the ALJ reached: that plaintiff's lithium levels were subtherapeutic because she was not taking lithium as prescribed. In September of 2008, Dr. Zhang observed that plaintiff had been treated with lithium and Seroquel with good results until she reduced her dosage. Plaintiff twice told Dr. Mattingly that she was doing well on her medication. On June 16, 2009, plaintiff told Amethyst Taylor that she was feeling better since being released from the hospital last week and that her medication was working. On February 12, 2010, plaintiff told Dr. Hicks at St. John's that she had no medication side effects. At no point did any of plaintiff's treatment providers express concern that her subtherapeutic lithium levels were due to any of the phenomena plaintiff cites, nor did they recommend that plaintiff do anything to resolve her subtherapeutic lithium levels other than to simply take lithium. Furthermore, there is no indication in the record that plaintiff's lithium levels remained subtherapeutic after lithium was given. The ALJ did not base his conclusion on his own lay opinion; he based this conclusion on substantial evidence in the record that plaintiff was repeatedly non-compliant with her medication regimen. Plaintiff's suggestions as to other possible causes of subtherapeutic lithium levels are merely speculative and are unsupported by the record. The ALJ was entitled to consider plaintiff's non-compliance with her medication

as inconsistent with her subjective complaints of symptoms precluding all work. Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (internal citation omitted) ("A failure to follow a recommended course of treatment also weighs against a claimant's credibility"); see also Choate v. Barnhart, 457 F.3d 865, 872 (8th Cir. 2006) (An ALJ may properly consider the claimant's non-compliance with recommended treatment).

The record does not support the conclusion that plaintiff was ever refused medical treatment or that she unwillingly went without needed medication due to a lack of medical insurance or an inability to pay. As the Eighth Circuit has noted, while evidence of financial hardship may justify a claimant's failure to take prescription medication, it is not an automatic excuse. Murphy v. Sullivan, 953 F.2d 383, 386 (8th Cir. 1992) (citing Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984)); Johnson v. Bowen, 866 F.2d 274, 275 (8th Cir. 1989); Brown v. Heckler, 767 F.2d 451, 453 n. 2 (8th Cir. 1985). As noted above, Dr. Zhang explained to plaintiff that lithium is inexpensive and readily attainable via community health clinics. (Tr. 214). Furthermore, the record indicates that plaintiff regularly smoked at least one pack of cigarettes per day. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999) (noting the lack of evidence that the claimant did not forego smoking in an effort to afford medication).

Further support for the ALJ's decision is found in plaintiff's statements to Dr. Morel that she planned to travel to

Kansas City to visit her brother for two weeks. Plaintiff's willingness and ability to engage in travel of such an extended duration is inconsistent with her testimony concerning her daily activities and her allegations of debilitating symptoms precluding all work. The undersigned also notes that, while plaintiff testified that she and her mother could not live together because plaintiff had homicidal tendencies towards her and could picture herself doing very bad things to her, the record demonstrates that, at all times relevant to plaintiff's applications, she lived in a duplex and that her mother lived next door. It is a reasonable assumption that, if plaintiff's homicidal tendencies towards her mother were of the severity as plaintiff asserts, she would be unable to live in such close proximity to her without incident.

Because the ALJ outlined good reasons for discounting the credibility of plaintiff's subjective allegations and relied on substantial evidence in the record in doing so, his credibility determination should be affirmed. <u>Travis v. Astrue</u>, 477 F.3d 1037, 1042 (8th Cir. 2007).

B. <u>RFC Determination</u>

Plaintiff contends that the ALJ's RFC determination was not supported by substantial evidence. In support, plaintiff states: "The ALJ derived his RFC finding based upon an improper, incorrect and incomplete evaluation of the evidence, as discussed *supra*, and the ALJ supported his RFC finding using the opinions of

one-time examining physicians whose opinions are not considered substantial evidence, especially in light of the conflicting opinion from Plaintiff's treating psychiatrist. Further, the ALJ failed to evaluate records of Plaintiff's hospitalization from February 2010." (Docket No. 16 at 16). Review of the ALJ's decision reveals no error.

Residual functional capacity is defined as that which a person remains able to do despite her limitations. 20 C.F.R. § 404.1545(a), Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of her symptoms and limitations. 20 C.F.R. § 404.1545(a); Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff, 421 F.3d at 793.

A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all relevant evidence, the ALJ is not required to produce evidence and affirmatively prove that a

claimant is able to perform certain functions. <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863. The claimant bears the burden of establishing her RFC. <u>Goff</u>, 421 F.3d at 790.

After engaging in a proper credibility analysis, the ALJ incorporated into plaintiff's RFC those impairments and restrictions found credible. <u>See</u> <u>McGeorge v. Barnhart</u>, 321 F.3d 766, 769 (8th Cir. 2003) (the ALJ "properly limited his RFC determination to only the impairments and limitations he found credible based on his evaluation of the entire record."). Plaintiff alleges error in that the ALJ failed to evaluate evidence of her hospitalization that occurred after her administrative hearing. Although the ALJ is required to develop the record fully and fairly, the ALJ is not required to discuss in detail every piece of evidence submitted, and a failure to cite to certain evidence does not mean it was not considered. <u>Black v. Apfel</u>, 143 F.3d 383, 386 (8th Cir. 1998). The ALJ in this case wrote that he had considered all of the evidence of record, and included in his decision lengthy discussion of the medical evidence submitted. Plaintiff's February 2010 hospitalization followed the same pattern the ALJ observed in his decision, in that plaintiff presented to the hospital with symptoms, was observed to have subtherapeutic levels of medication in her system, and her condition stabilized after she was given medication. The fact that the ALJ's opinion does not include a discussion of plaintiff's February 2010 hospitalization does not constitute error.

Plaintiff contends that the ALJ supported his RFC determination using the opinions of one-time examining physicians whose opinions are not considered substantial evidence. Review of the record reveals no error.

The ALJ in this case wrote that he gave "great weight" to Dr. Zhang's opinion and some weight to Mr. Yunker's opinion. The ALJ wrote that he had declined to give significant weight to Dr. Morel's opinion, and that he gave no weight to Ms. Taylor's opinion. The ALJ reached these conclusions in accordance with the Commissioner's regulations, 20 C.F.R. §§ 404.1527(d) and 416.927(d), and the evidence of record.

A treating physician's opinion is generally entitled to substantial weight, but it does not automatically control, because the ALJ must evaluate the record as a whole. Davidson v. Astrue, 501 F.3d 987, 990 (8th Cir. 2007) (citing Charles v. Barnhart, 375 F.3d 777, 783 (8th Cir. 2004)). When an ALJ discounts a treating physician's opinion, he should give "good reasons" for doing so. Davidson, 501 F.3d at 990 (citing Dolph v. Barnhart, 308 F.3d 876, 878 (8th Cir. 2002)). When a treating physician's opinion is inconsistent with his or her treatment notes, it is proper for an ALJ to decide that it is entitled to less than controlling weight. See Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006). If justified by substantial evidence in the record as a whole, the ALJ can discount the opinion of an examining physician or a treating physician. See Rogers v. Chater, 118 F.3d 600, 602 (8th Cir.

1997); <u>Ward v. Heckler</u>, 786 F.2d 844, 846 (8th Cir. 1986).

In his decision, the ALJ noted that he was declining to give Dr. Morel's opinion significant weight because she was a resident physician and not a licensed psychiatrist, and because of the limited scope of her treatment relationship with plaintiff. This finding was proper.

On June 8, 2009, using a checklist form provided by plaintiff's attorney, Dr. Morel opined that plaintiff had "moderate" and "marked" limitations in several domains of functioning, and speculated that plaintiff's bipolar disorder would cause her to miss work and/or be late for work as often as three days per month. In declining to give this opinion significant weight, the ALJ noted plaintiff's limited treatment relationship with Dr. Morel. Plaintiff first saw Dr. Morel in February of 2009. Dr. Morel offered her checklist opinion in June of 2009, and had stopped seeing plaintiff entirely by August of 2009. Plaintiff's limited treatment relationship with Dr. Morel was an appropriate factor for the ALJ to consider. <u>See</u> <u>Casey v. Astrue</u>, 503 F.3d 687, 692 (8th Cir. 2007) (When deciding "how much weight to give a treating physician's opinion, an ALJ must also consider the length of the treatment relationship and the frequency of examinations."). The ALJ also noted that Dr. Morel was a post-graduate medical resident, not a licensed psychiatrist, and her opinion was therefore not entitled to the weight typically afforded to specialists. 20 C.F.R. §§ 404.1527(d)(5) and 416.927(d)(5). Dr.

Morel's treatment notes do not contain medical findings, such as the results of mental status examinations or psychiatric testing, that would tend to support the limitations she endorsed on her opinion checklist. Dr. Morel repeatedly found that plaintiff was alert, cooperative, focused, and calm, and that she exhibited good eye contact and an normal mood. The Regulations and Eighth Circuit precedent clearly require that a medical opinion be well-supported by medical evidence to be entitled to substantial or controlling weight. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); Hacker, 459 F.3d at 937. The ALJ also noted that Dr. Morel's opinion evidence was not consistent with her own treatment notes. This observation is supported by the record. On May 4, 2009, shortly before offering her opinion, Dr. Morel noted that plaintiff was improving, and on July 27, 2009, shortly after offering her opinion, she noted that plaintiff was stable. Furthermore, as noted above, Dr. Morel repeatedly noted essentially normal findings upon mental status examination. See Hacker, 459 F.3d at 937 (An ALJ may properly decline to give controlling weight to a treating physician's opinion when it is inconsistent with her treatment notes).

Plaintiff also alleges error in the ALJ's treatment of the opinions of therapist Amethyst Taylor. As noted in the above discussion of the medical evidence of record, Ms. Taylor offered checklist opinions in June and December of 2009. Both of Ms. Taylor's opinions endorsed significant functional restrictions, but her December opinion endorsed restrictions more serious than in

June and more serious than those endorsed by Dr. Morel. The ALJ wrote that Ms. Taylor's assessments were not entitled to any weight as medical opinions but that her opinions and treatment records were considered to assess plaintiff's functional limitations. (Tr. 14). The ALJ also wrote that Ms. Taylor's opinions were inconsistent with the GAF scores she assessed, which were consistent with only moderate functional limitations. Review of the record reveals no error in the ALJ's treatment of Ms. Taylor's opinions.

Amethyst Taylor was a therapist with a master's degree, and was therefore not an "acceptable medical source" as such is defined in the Regulations. 20 C.F.R. §§ 404.1513(a), 416.913(a). The Regulations provide that evidence to establish disability must come from "acceptable medical sources," which are defined as licensed medical or osteopathic physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a)(1)-(5), 416.913(a)(1)-(5). Therapists, like Ms. Taylor, are specifically defined elsewhere in the Regulations as "other sources" whose opinions may help understand how a claimant's impairments affect her ability to work. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). The ALJ's treatment of Ms. Taylor's opinions is entirely consistent with the Regulations: the ALJ properly considered them as aids to understanding how plaintiff's impairments affected her ability to work, but did not consider them

as acceptable sources of medical information to prove disability.
See Id.

Furthermore, Ms. Taylor's opinions were inconsistent with each other and with her own treatment notes. As set forth in the above summary of the medical information of record, Ms. Taylor's December opinion endorsed greater restrictions than she endorsed the preceding June. However, in both opinions, she stated that plaintiff's restrictions had lasted, or were expected to last, twelve months. Because Ms. Taylor's opinions were themselves inconsistent, they were entitled to less weight. See Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) (where the treating physician's opinions are themselves inconsistent, they are entitled to less deference).

Plaintiff also contends that the ALJ failed to examine the evidence from Mr. Yunker and Drs. Zhang and Marietta using the factors of 20 C.F.R. §§ 404.1527(d)(1)-(6) and 416.927(d)(1)-(6). Plaintiff does not, however, support this contention with any argument regarding how the ALJ should have analyzed any of the factors she cites in a manner favorable to her. Nevertheless, the undersigned has considered plaintiff's contention in light of the ALJ's decision and the record as a whole, and finds no error. 20 C.F.R. §§ 404.1527(d)(1)-(6) and 416.927(d)(1)-(6) govern the manner in which medical opinions are weighed. In his decision, the ALJ wrote that he had carefully reviewed the evidence of record and had considered the opinion evidence "in accordance with the

requirements of 20 C.F.R. 404.1527 and 416.927" and with certain Social Security Rulings. (Tr. 11). While the ALJ did not perform a factor-by-factor analysis of this evidence, he stated that he had considered those factors and explained his rationale in a manner that allows the undersigned to follow his line of reasoning, including stating the amount of weight given to this evidence. The ALJ discussed Mr. Yunker's extensive evaluation of plaintiff and his findings; he discussed Dr. Marietta's treatment of plaintiff at St. John's hospital and his observations of her condition upon both admission and discharge; and he discussed plaintiff's treatment by Dr. Zhang at St. John's hospital. Because plaintiff does not specify which factors she feels the ALJ incorrectly analyzed or omitted, or how the ALJ should have weighed any of the factors in her favor, the undersigned is unable to address her contention further.

Plaintiff also contends that the ALJ erred in assigning greater weight to Mr. Yunker's opinion than to the opinions of her treating sources. The ALJ wrote that he was giving Mr. Yunker's opinion "some evidentiary weight," and wrote that it contained some of the most "consistent and compelling" evidence. (Tr. 15). The ALJ properly evaluated and weighed Mr. Yunker's opinion. "When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions." Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). Generally, the report of a one-time consultative examiner does not constitute substantial

evidence, especially when contradicted by the claimant's treating physician's opinion. Id. However, the Eighth Circuit has recognized two exceptions to this general rule: (1) where other medical assessments are supported by better or more thorough medical evidence; or (2) where a treating physician renders inconsistent opinions that undermine the credibility of such opinions. Id. (internal citations and quotations omitted). Mr. Yunker was a licensed psychologist, and his opinion was therefore entitled to greater weight for opinions related to that field. See 20 C.F.R. §§ 404.1513, 416.913. As the ALJ properly noted, Mr. Yunker performed an extensive evaluation of plaintiff and submitted a comprehensive report detailing his findings upon examination and the results of psychological testing, and the opinions he expressed were consistent with those findings. The ALJ properly evaluated all of the medical evidence of record, and properly determined to give Mr. Yunker's opinion preferential status over the opinions of Dr. Morel and Amethyst Taylor.

Plaintiff also alleges error in the ALJ's treatment of plaintiff's GAF scores, arguing that she had scores of 35 or below and one of 15, and the ALJ failed to properly consider her entire GAF score history. Review of the decision reveals no error.

GAF scores are subjective determinations representing the clinician's judgment of the individual's overall level of functioning. Jones v. Astrue, 619 F.3d 963, 973 (8th Cir. 2010) (internal citations omitted). The failure to reference a GAF score

does not, in and of itself, justify remand.  Id. (internal citations omitted).  Moreover, the Commissioner has declined to endorse GAF scores for use in social security disability determinations, and has indicated that such scores do not directly correlate with the severity requirements of the mental disorders listings.  Id. (internal citations omitted).  An ALJ may properly give greater weight to medical evidence and testimony than to GAF scores where the evidence so requires.  Id. (citing Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 666 (8th Cir. 2003)).

In his decision, the ALJ discussed several of plaintiff's GAF scores, including Mr. Yunker's assessment of a GAF score of 78 and Dr. Marietta's assessment of a GAF score of 35, and included in his decision definitions of both GAF scores from the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, Text Revision (DSM-IV-TR).  In conjunction with noting Dr. Marietta's assessment of a GAF score of 35, the ALJ noted that plaintiff's lithium level had been observed to be subtherapeutic at that time.  The ALJ also noted Dr. Ahmad's initial assessment of a GAF score of 35, and a later GAF score of 51, noting that this was consistent with improved clinical findings.  The ALJ's discussion of plaintiff's GAF scores is consistent with the ALJ's observation that plaintiff experienced an exacerbation in symptoms when she did not take medication, and stabilized after she was treated with the proper dosages of medication.

Plaintiff also contends that the ALJ erroneously

considered the fact that she always improved after she was hospitalized and medicated, stating that the ALJ failed to recognize the unpredictable course of mental illness. Plaintiff also argues that the ALJ failed to consider her condition of chronic mental illness and failed to take into account "variations in functioning longitudinally" associated with her bipolar disorder that could compromise her capacity for work, inasmuch as she would have trouble getting to work regularly, being supervised, and remaining in the workplace. (Docket No. 16 at 15). However, the record in this case supports the ALJ's findings regarding plaintiff's bipolar disorder.

The ALJ determined that plaintiff's bipolar disorder caused moderate limitation in the area of concentration, persistence and pace, and mild limitations in the domains of activities of daily living and social functioning. As discussed in the above summary of the medical evidence, plaintiff was hospitalized in September of 2008 and February of 2009, and again on February 12, 2010, the day after her hearing before the ALJ. As noted above, this was plaintiff's pattern: after a period of doing well on her medications, plaintiff would experience an exacerbation of her symptoms, and would be noted upon hospital admission to have subtherapeutic levels of medication in her system. Once plaintiff was hospitalized and medicated, her symptoms would abate, she would report feeling better, her medical treatment providers would note that her condition had responded well to medication, and she would

be discharged to home in stable condition within a few days.  None of plaintiff's medical treatment providers indicated that plaintiff's non-compliance with her medications was a function of her condition, or that she required treatment or other intervention to ensure she took her medications, and plaintiff offers no evidence tending to support such a conclusion.  The record supports the ALJ's conclusion in this regard.  Conditions which are controllable or amenable to treatment are not considered disabling. See Wheeler v. Apfel, 224, F.3d 891, 895 (8th Cir. 1996) (citing Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997) (holding that impairments which are controllable or amendable to treatment do not support a finding of disability, and failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits).

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole.  The ALJ based his decision on all of the credible, relevant evidence of record and, despite plaintiff's suggestions to the contrary, properly evaluated and weighed the medical evidence of record and properly explained the weight given thereto.  For all of the foregoing reasons, the undersigned determines that the ALJ's RFC determination is supported by substantial evidence on the record as a whole.

C.    Past Relevant Work

The ALJ in this case determined that plaintiff could perform her past relevant work of order picker, production line worker, packager, and housekeeper. Before making this finding, the ALJ presented to the VE a hypothetical question that fully encompassed the foregoing residual functional capacity and all of the mental limitations he found credible and supported by the record as a whole, and heard testimony from the VE that such an individual could perform the listed jobs. In his decision, the ALJ cited the VE's testimony and also wrote that he had compared the plaintiff's residual functional capacity with the physical and mental demands of that work, and concluded that plaintiff could perform it as it was actually and generally performed. The ALJ also wrote that the VE's testimony was consistent with the Dictionary of Occupational Titles and its companion publication, the Selected Characteristics of Occupations. Plaintiff challenges this determination, arguing that she did not perform any of these occupations at the substantial gainful activity level. In a footnote, however, plaintiff cites only her past work as an order picker, packager, and housekeeper as jobs with earnings below the substantial gainful activity level. Specifically, plaintiff states that she worked as an order picker in 1998 and earned $1,416.73; as a packager in 2000 and earned $6,719.40; and as a housekeeper in 2000 and earned $3,664.00. Plaintiff further contends that the ALJ failed to make explicit findings regarding the mental demands of her past work, citing <u>Groeper v. Sullivan</u> in support. Review of

the ALJ's decision reveals no error.

At step four of the sequential evaluation process, the ALJ considers whether the claimant has the capacity to do her "past relevant work." 20 C.F.R. §§ 404.1520(a), 416.920(a). In order for a claimant's past work to be considered "relevant" for such purposes, it "must have been done within the last 15 years, lasted long enough for the person to learn to do it, and constituted 'substantial gainful activity.'" Reeder v. Apfel, 214 F.3d 984, 989 (8th Cir. 2000) (internal citations omitted). The Regulations define "substantial gainful activity" as "work activity that involves doing significant physical or mental activities, even if done on a part-time basis, and work that is done for pay or profit, whether or not a profit is realized." Id. (citing 20 C.F.R. § 404.1572(a), (b)). A claimant's earnings "will ordinarily show" that she has engaged in substantial gainful activity if they average $500.00 per month from January 1990 through June 1999; $700.00 per month from July 1999 through December 2000; and, beginning January 1, 2001, an average of more than the larger of the amount for the previous year, or an amount adjusted for national wage growth. 20 C.F.R. § 404.1574(b)(2), 416.974(b)(2)(i).

The undersigned finds the Reeder decision particularly instructive. There, the claimant challenged the ALJ's determination that she could return to her past work as a fruit picker and packer, arguing that this work could not be considered

substantial gainful activity because her earnings did not satisfy the earnings requirements under the Regulations. Reeder, 214 F.3d at 989. In response, the Commissioner argued that the claimant's earnings satisfied the earnings requirement when her monthly income was averaged over the four or five months out of the year that she was seasonally employed, rather than over the entire year. Id.

In upholding the ALJ's decision to consider the job past relevant work, the Eighth Circuit wrote that it was "unnecessary to engage in this averaging debate," and that "[a]lthough earnings below the guidelines will 'ordinarily' show that an employee has not engaged in substantial gainful activity, earnings below the guidelines will not conclusively show that an employee has not engaged in substantial gainful activity." Id. (citing Pickner v. Sullivan, 985 F.2d 401, 403 (8th Cir. 1993)). The Eighth Circuit noted that the Regulations stated that work may be considered "substantial" even if it was part-time; and "gainful" even if no profit is realized if it is the type of work typically done for pay or profit. Reeder, 214 F.3d at 989 (internal citations omitted).

That her income fell below the presumptive threshold is the only evidence plaintiff herein offers to support her argument that she did not perform these jobs at the substantial gainful activity level. Earnings below the guidelines will not conclusively show that an employee has not engaged in substantial gainful activity. Id. (internal citations omitted). In the case at bar, plaintiff does not present, nor is the undersigned aware

of, any authority supporting the conclusion that the jobs of order picker, packager, and housekeeper are jobs which are not typically done for pay or profit or which do not involve significant physical or mental activities, or that plaintiff had not learned the jobs. In addition, plaintiff's earnings summary shows that she earned $17,058.35 in 1998; $13,029.87 in 2000; $13,904.25 in 2001; and $13,255.83 in 2005. (Tr. 138). The undersigned is not suggesting that plaintiff earned this income from the cited jobs. However, this evidence does show that plaintiff consistently earned in excess of $1,000.00 per month during each year she cites in her argument on this point, tending to demonstrate that plaintiff's low earnings in the cited jobs were more likely the result of her choice regarding her work schedule than an indication of a mental inability to perform the jobs at the presumptive substantial gainful activity level. See Reeder, 214 F.3d at 989 (finding that Ms. Reeder's low earnings were more the result of her choice to work only seasonally than an indication of a physical or mental inability to do the work throughout the year and that, regardless of her low earnings, her seasonal work was substantial gainful activity and the ALJ properly considered it to be past relevant work). Finally, even if it could be said that the ALJ should not have considered the cited jobs as substantial gainful activity, plaintiff makes no attempt to argue that her earnings from her production line worker job were below the presumptive threshold for substantial gainful activity, and the undersigned sees no evidence

in the record tending to support such a conclusion. The undersigned concludes that the ALJ properly considered plaintiff's work as an order picker, packager, housekeeper, and production line worker as substantial gainful activity.

Finally, plaintiff contends that the ALJ failed to make explicit findings regarding the mental demands of plaintiff's past work. The Eighth Circuit has said that the ALJ must "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform past relevant work." Nimick v. Secretary of Health and Human Services, 887 F.2d 864, 866 (8th Cir. 1989). For a claim involving mental or emotional impairment, the ALJ should investigate the demands of the past jobs in order to determine if the claimant's mental impairment is compatible with the job. Groeper, 932 F.2d at 1238. In so investigating, the ALJ may rely on the claimant's description of her actual job, or may look to how the job is performed in the national economy. Stephens v. Shalala, 50 F.3d 538, 542 (8th Cir. 1995). The ALJ also satisfies the duty to make explicit findings by referring to the DOT's job description of the claimant's past work. Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1991). The ALJ may also rely upon vocational expert testimony to fulfill this obligation. Wagner, 499 F.3d at 854.

The Groeper decision is not helpful to plaintiff. In

Groeper, there was no vocational expert testimony concerning plaintiff's past work. In the case at bar, however, the ALJ elicited VE testimony regarding all of plaintiff's past jobs, presented a hypothetical to the VE that fully described plaintiff's RFC and all of the mental impairments that the ALJ properly determined were supported by substantial evidence on the record as a whole, and asked the VE whether such an individual could perform any of the jobs the VE had described. In response, the VE testified that such an individual would remain able to able to perform plaintiff's past jobs as an order picker, production line worker, packager, and housekeeper. In his decision, the ALJ went on to say that he had specifically determined that the VE's testimony regarding plaintiff's past jobs was consistent with the Dictionary of Occupational Titles and its companion publication, the Selected Characteristics of Occupations. See Cruze, 85 F.3d at 1323 ("Testimony from a VE based on a properly phrased hypothetical question constitutes substantial evidence."). The ALJ properly fulfilled his duty to make detailed findings about the mental demands of plaintiff's past relevant work. See Pfitzner, 169 F.3d at 569; Wagner, 499 F.3d at 854.

Therefore, for all of the foregoing reasons, on the claims that plaintiff raises,

**IT IS HEREBY RECOMMENDED** that the Commissioner's decision

be affirmed.

The parties are advised that they have until June 15, 2012, to file written objections to this Report and Recommendation. Failure to timely file objections may result in a waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).

_____
Frederick R. Buckles
UNITED STATES MAGISTRATE JUDGE

Dated this 1st day of June, 2012.